UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION


United States of America,      )
                               )
          Plaintiff,           )
                               )
     vs.                       )    Case No. 3:21CR13
                               )
Vinath Oudomsine,              )
                               )
          Defendant.           )
_____)


SENTENCING HEARING
BEFORE THE HONORABLE DUDLEY H. BOWEN, JR.
UNITED STATES DISTRICT COURT JUDGE
FRIDAY, MARCH 4, 2022; 12:47 P.M.


FOR THE PLAINTIFF:

     Jonathan Alan Porter, Esquire
     U.S. Attorney's Office
     Post Office Box 8970
     Savannah, Georgia 31401
     (706)724-0517

FOR THE DEFENDANT:

     C. Brian Jarrard, Esquire
     C. Brian Jarrard, LLC
     4108 Arkwright Road, Suite 2
     Macon, Georgia 31210
     (478)477-0004

OFFICIAL COURT REPORTER:

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

1        (Call to Order at 12:47 p.m.)

2             THE CLERK:  The court calls case 3:21CR13.  United

3    States of America versus Vinath Oudomsine.  Representing the

4    government, Jonathan Porter.  For defendant, Brian Jarrard.

5    Here for sentencing.

6             MR. PORTER:  Ready to proceed, Your Honor.

7             THE COURT:  Mr. Oudomsine, on October 28, 2021, you

8    entered a guilty plea as to count one of the information

9    charging you with wire fraud in violation of federal law.  Have

10   you had the opportunity to read and consider the Presentence

11   Investigation Report with your lawyer?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  Do you or your lawyer have any objections

14   as to the factual statements of the report?

15            THE DEFENDANT:  No, Your Honor.

16            THE COURT:  In that there are no objections to the

17   factual statements and I have seen no concerns expressed about

18   the application of the advisory sentencing guidelines I will

19   adopt the factual statements as my own findings of fact.  Here

20   the statutory penalty is a 20-year prison term; the total

21   offense level is 11; criminal history category is I (one)

22   Providing for 8 to 14 months imprisonment, one to three years

23   on supervised release, 4,000 to $40,000 in fines, restitution

24   $85,000, and a $100 special assessment.

25            Is there any reason why we should not proceed into

1  sentencing at this time?

2          MR. JARRARD:  No, Your Honor.

3          MR. PORTER:  Not from the government, Your Honor.

4          THE COURT:  I will make mention into the open record

5  in this case that Mr. Jarrard had made a statement there are

6  some restitution funds which are payable to the Clerk and those

7  will be presented according to his dictates.

8          Mr. Oudomsine, you have the right during this

9  proceeding to be heard in your own behalf.  More importantly, I

10  will tell you I encourage you to speak in your own behalf.

11          Okay.  Mr. Jarrard, I'll call on you.

12          MR. JARRARD:  Thank you, Your Honor.  My request is

13  that the Court sentence my client to time served by virtue of,

14  frankly, either a downward variance under 3553 or a downward

15  departure, Your Honor.  I will first highlight certain

16  information in the Presentence Report.

17          As the Court knows Your Honor ordered my client into

18  custody at his change of plea.  He plead to an information

19  pre-indictment and appeared voluntarily for his change of plea

20  and the Court ordered him into custody at that time.  He has

21  been in custody as we stand before you 126 days.  So, of

22  course, that's four months and a few days.

23          My client, Your Honor, is 32 years old.  He's a

24  naturalized citizen of this country having immigrated with his

25  parents and his family, all of whom are with us today -- all of

1   his family, just raise your hands if you would -- you'll see

2   seated behind us, Your Honor.  That includes all of his -- that

3   includes his parents and his siblings all who are listed in the

4   Presentence Report.  My client has several degrees, his highest

5   degree, of course, being a bachelors's degree and as noted he

6   is a naturalized U.S. citizen.

7           Your Honor, with respect to -- of course, he came in

8   as early as the process would allow and plead, admitted his

9   responsibility for this fraud related to the Corona Virus

10  relief funds.  He has now returned the Pokémon card that was

11  used with some of these funds and my office, through my

12  associate at the time, worked with Xavier Cunningham with the

13  U.S. Attorney's Office to, one, determine the maximum

14  restitution in light of the reality of the return and

15  forfeiture of the Pokémon card and so the amount I have present

16  today, though it's in two cashier's checks, is the total

17  restitution figured by Mr. Cunningham and my office.

18          Now we acknowledge, of course, that if the forfeiture

19  process means that the Pokémon card is not sold through the

20  governmental process for sufficient funds to cover the full

21  restitution, then there may be an additional restitution

22  obligation.  Given the valuation of that card, we don't

23  anticipate that being the case.  I tell you all that, Your

24  Honor, as that with respect to the funds, certainly, my client

25  and I had to wait on the order from the Court.  We weren't

1   waiting on the Court.  The Court was waiting on us to negotiate

2   with Mr. Cunningham, but we had to have that order in place

3   before the prejudgment restitution could be paid.  We have

4   done -- or my client working in conjunction with his family has

5   done everything he could to make sure prior to today we have

6   addressed the return of the card and the full restitution

7   payment.

8           As you note, Your Honor, my client has zero criminal

9   history points.  He's had no prior juvenile or criminal

10  problems whatsoever and no other noted criminal conduct.  I

11  tell you all that, Your Honor, to say that I think this case

12  clearly falls within the United States Sentencing Guidelines

13  5K2.20 for aberrant behavior.  I think it's entirely

14  appropriate for the Court to just treat it as a variance under

15  3553, but when the Court considers the United States Sentencing

16  Guideline and the Policy Statement contained in the aberrant

17  behavior guideline my client meets all of the criteria of

18  5K2.20.  Particularly, Your Honor, this is, as in the language

19  of the guidelines, a clear departure from an otherwise

20  law-abiding life and it is an event without significant

21  planning of limited duration, and, again, it represents a

22  marked deviation by this defendant from his otherwise

23  law-abiding life.

24          Unlike most of the clients I have stood in front of

25  Your Honor with, my client is very fortunate to have a loving,

1  supportive extended family, all of whom, again, are here in

2  support of him today.  He was raised in a two-parent home.  He

3  is a high school graduate and, again, as I note a naturalized

4  United States citizen having been naturalized as a citizen in

5  2003 along with his family.  As an indication of the stability

6  of his family life you will note on page 8 of the Presentence

7  Report he has a brother who is a medical component

8  manufacturer; he has a brother who is in polymer testing; and

9  he has two siblings who are college students; and, again, as

10 noted earlier my client is a high school graduate.

11        In fact, I note for Your Honor that this case is also

12 remarkable in my dealings because my client has a core group of

13 friends who have been with him since his days at Habersham High

14 School.  Some of those friends and not to misspeak -- I don't

15 know which of these three friends I'll point out to you; maybe

16 all of them -- actually, I know Ms. Bohannon doesn't go all of

17 the way back to Habersham as they met in college and as I spoke

18 with Ms. Bohannon, essentially, a core group of students from

19 Habersham High School went off to college together.  I think it

20 was Young Harris and that crew stayed together and Vin was a

21 portion or a member of that group.

22        We have with us today -- and I'd ask them just to

23 raise their hand -- Caitlyn Bohannon which is one of the friend

24 group, Your Honor.  Ms. Bohannon has a career in marketing.  We

25 have Michael Gale.  Mr. Gale is in commercial real estate with

1    Wells Fargo and then finally we have Austin Schlieman.  He is

2    in the wealth management field.  As I noted earlier all of

3    Mr. Oudomsine's family members are seated either beside his

4    friends or in front of them.

5           The Presentence Report notes what his specific degrees

6    are and you also note, Your Honor, on page 9 that Vin was

7    enlisted -- it's paragraph 44, Your Honor -- he was enlisted in

8    the United States Army Reserve.  We certainly anticipate -- I

9    don't know if -- I suspect that this conviction certainly means

10   he will not remain in the Reserves.  I am not privy to know

11   whether that means he will be dishonorably discharged or how

12   that will work, but amongst all of the ramifications of being a

13   convicted felon he certainly has to yet answer to the United

14   States Army Reserves with respect to his status there, but I do

15   think it is somewhat indicative of the individual you have in

16   front of you that though he's now made a mistake that may

17   foreclose those options for him he immigrated to this country

18   with his family and thought it appropriate to join our armed

19   forces.

20          Your Honor, as I began I would ask that you either

21   treat it as a variance or that you depart downward under the

22   aberrant behavior guideline.  I will note, Your Honor, that the

23   Application Notes to the guidelines say that in many cases

24   fraud cases are not treated under the aberrant guidelines, but

25   this fraud was not a complicated fraud and one that I

1  respectfully submit does not disqualify an aberrant behavior

2  downward departure.

3              Under 3553(a), Your Honor, I respectfully submit that

4  it would be sufficient, but not greater than necessary, to give

5  my client a time-served sentence.  Your Honor, I have, as you

6  know, had some experience in this court and I don't presuppose

7  to know what the Court's justification or thinking is in any

8  given case -- that's not my province, but I do have an

9  appreciation for the fact that my client having been in the

10  Laurens County Jail for 126 days as opposed to a federal prison

11  camp in my opinion is more punitive.  What I mean by that is

12  it's more punitive than being in a prison camp in the federal

13  system for 126 days.

14              So I would ask you to give him time served.  I know

15  this is his Zone B guideline range.  If the Court disagrees

16  with me on a pure time-served sentence, I would ask at least

17  for a split -- not a split sentence, but to allow any remaining

18  term to be served on home confinement if Your Honor is not

19  inclined to give him a straight time-served sentence.  Thank

20  you, Your Honor.

21              THE COURT:  Will I hear from your client?

22              MR. JARRARD:  Yes, Your Honor.  He intends to speak to

23  Your Honor.

24              THE DEFENDANT:  Good afternoon, Your Honor.  I want to

25  say that I want to apologize for -- I want to apologize to my

1   family and friends.  They have been nothing but supportive and

2   helpful throughout this whole ordeal.  I am so indebted to

3   them.  They mean a lot to me.  I love you guys.  I really do.

4        I want to apologize for my actions.  I understand that

5   what I done was wrong and I am going to have to live with that

6   mistake for the rest of my life.  I need to use -- I need to

7   learn to use better judgment and make wiser decisions in the

8   future.  In the long run prior to this event I kept my nose out

9   of trouble and this mistake that happened has been costly to

10  me.  So I apologize for that.  That's all I have to say, Your

11  Honor.

12        THE COURT:  Mr. Jarrard, where are these checks that

13  you've been talking about and what's the total amount?

14        MR. JARRARD:  Your Honor, I have both cashier's checks

15  made payable to U.S. District Court Clerk.  They're payable

16  from South State Bank.  One is in the amount of $20,000 and one

17  is in the amount of $4,745.90.  Those together total the full

18  total listed in the Court's order regarding prejudgement

19  payment.

20        THE COURT:  All right.  You can present those to the

21  Clerk if you'd like.

22        MR. JARRARD:  Thank you, Your Honor.

23        THE COURT:  Mr. Porter, do you have any comments from

24  the United States?

25        MR. PORTER:  Briefly, Your Honor.  Your Honor, in the

1   face of a pandemic that was threatening the shutdown of our

2   nation's economy Mr. Oudomsine invented a fake entertainment

3   services business.  He said that business had existed since

4   December of 2018, had $235,000 in gross revenue the year prior

5   to the pandemic, and had ten employees.  Your Honor, these were

6   lies.  These were lies to defraud the program constructed by

7   Congress to provide disaster loans to real small businesses

8   during early days of Covid-19 pandemic.

9          While millions of real small business were finding

10  ways to keep their lights on, Vinath Oudomsine lied and then he

11  used the loans to buy, of all things, a Pokémon card.  Your

12  Honor, that's why we're here:  Blatant abuse of a government

13  relief program during a pandemic.

14         Now, Mr. Oudomsine had the good sense not to go as far

15  as some other Covid-19 fraudsters.  He didn't invent half a

16  dozen fake businesses.  He didn't invent fake tax documents

17  which a lot did.  He didn't create fake bank records and he

18  didn't lie about it when the FBI approached him.  To his credit

19  Mr. Oudomsine immediately took responsibility and was honest

20  with the FBI.  That certainly doesn't excuse what he did, but

21  it is worth noting.

22         Your Honor, there are a lot of these cases.  I have

23  been working these cases like crazy over the last year plus.

24  Just yesterday I proffered a target who had done over 200

25  fraudulent PPP loans for people.  In the day before that I was

1    at an arraignment of an attorney -- an attorney who we indicted

2    for getting EIDLs for fake businesses and creating fake tax

3    documents to fool the SBA.

4           Your Honor, we're going to see a lot of these cases

5    coming up, and we're taking all of these seriously from the

6    attorneys who are doing this to the people who are doing

7    hundreds of these loans down to the people like Mr. Oudomsine

8    who committed fraud once.  They're all fraud.  They're all

9    abhorrent and we're going to commit resources to holding those

10   committing fraud accountable.

11          Your Honor, I would ask the Court to take those

12   factors into consideration when crafting Mr. Oudomsine's

13   sentence, but it should certainly be a sentence that makes

14   clear that you cannot defraud the government, especially not in

15   the midst of a pandemic.  Thank you, Your Honor.

16          THE COURT:  I am going to ask you, Mr. Porter, because

17   I am curious about it -- I know that the matter must proceed in

18   an orderly process; however, just as Mr. Oudomsine has been

19   incarcerated for 120 days, from what Mr. Jarrard tells me there

20   seems to be a level of complacency about this super valuable

21   Charizard Pokémon card.  I haven't got Mr. Cunningham here to

22   talk to; so I am talking to you.

23          MR. PORTER:  Yes, Your Honor.

24          THE COURT:  We got a war going on.  These are the sort

25   of the things that happened.  The vagaries of the market place

1   become even more accentuated with the passage of time.  I'm not

2   going to accept some enormous valuation of a piece of paper

3   that has some mysterious properties that make it so valuable.

4   I don't mind accepting restitution payments whenever I can get

5   them, but the restitution in this case until I hear different

6   is 85,000 from which $24,745 may, upon negotiation of the

7   checks, be deducted.  What's wrong with that?

8           MR. PORTER:  Nothing, Your Honor, and I am happy to

9   relay to Mr. Cunningham how quickly the Court would like for

10  things to happen from here in terms of liquidating that card.

11          THE COURT:  He could have had an order whenever he

12  wanted.  I don't know when he got it.  That's another thing.  I

13  have never been supplied by anybody, especially the defendant,

14  a history of what happened to that card.  All I got was some

15  bland statement it had been sent off to Atlanta to a family

16  member --

17          MR. PORTER:  Your Honor, I ---

18          THE COURT:  -- maybe one of the people here.

19          MR. PORTER:  Your Honor, I am happy to proffer that or

20  I know Mr. Jarrard may know the history as well.  I'm happy to

21  answer that question.

22          THE COURT:  Well, I'd love to hear about it.

23          MR. PORTER:  Yes, Your Honor.  So as soon as Agent

24  Kirkland interviewed Mr. Oudomsine he told Agent Kirkland where

25  the card was, made ---

1          THE COURT:  The agent told me specifically he said he

2     sent it off to a family member.

3          MR. PORTER:  Yes, but we were aware that it was with a

4     family member and Mr. Oudomsine made arrangements to meet Agent

5     Kirkland to show him the card.  That's about the time when

6     Mr. Dixon ---

7          THE COURT:  Show him the card?

8          MR. PORTER:  Yes, Your Honor.

9          THE COURT:  All right.

10         MR. PORTER:  Just to verify that it was still in

11    existence.  Mr. Dixon then was retained and wanted to go

12    through I would say more formal court recognition of forfeiting

13    the card, but it was always our understanding that the card was

14    going to be forfeited.  Mr. Oudomsine never backed away from

15    that.  We just wanted the court to be involved in that process.

16         MR. JARRARD:  Your Honor, if I could add to that, as

17    the Court knows Mr. Dixon was my client's first attorney and

18    then I came onto the case.  I can't speak to what Mr. Dixon

19    did, but I can tell you that, yes, once I was retained the card

20    had not been surrendered and my office immediately began

21    working with Mr. Cunningham on the appropriate orders to allow

22    the acceptance for forfeiture of the card and it is my

23    understanding and what I was -- I had an associate with me at

24    the time, Your Honor, that was doing some of the logistics for

25    this, but that once I was his counsel as soon as that card

1    could be turned over it was turned over by virtue of a meeting

2    with Mr. Kirkland's colleagues in Atlanta with the family to

3    immediately turn over the Pokémon card.

4         We did it from my office's perspective, Your Honor, as

5    quickly as we could, and I will represent that my client as

6    soon as I met with him wanted that to be the case and there was

7    never any discussion about it.  It was beyond debate, and now

8    the payments we have made as quickly as the process would allow

9    to, one, figure out -- let me comment on one thing you said,

10   Your Honor.  Let me be crystal clear and my client understands

11   this because I have explained it to him:  We're not saying that

12   what the court presently has satisfies the restitution

13   obligation until we all know that that card sells for

14   sufficient amounts to satisfy.  We understand there is a

15   $85,000 restitution obligation.

16        What Mr. Cunningham and my associate did at the time

17   was to try to figure out, given what we believe the value of

18   the card to be, what do the checks need to be and that's where

19   that 24,000 and change came from, but it is my client's full

20   intent and it always has been while I have represented him to

21   make full restitution understanding that the 85,000 was the

22   restitution to be paid.

23        THE COURT:  Well, Mr. Jarrard, Mr. Porter, I

24   appreciate y'all having such confidence in the ability of the

25   United States Attorney and the Marshals and the FBI to sell a

1  Pokémon card.  That's a different approach.  I see absolutely

2  nothing wrong with having seen the card for the FBI agent to

3  say "thank you" and take it and bring it to the U.S. Attorney.

4  I don't know why it had to be preceded by an order.  In my

5  opinion it does not.  I would favor expediency in a situation

6  like that, and I don't want to comment in any way by

7  implication or otherwise on Mr. Dixon, a former United States

8  Attorney and a very experienced lawyer, and I know that

9  Mr. Jarrard has no such intention, but my point will be that

10  there was no suggestion of an immediate transfer of that card

11  until after this man had been put in the Laurens County Jail.

12  That's a fact.

13          All right.  What else, Mr. Porter?

14          MR. PORTER:  Nothing else, Your Honor.

15          THE COURT:  Mr. Jarrard?

16          MR. JARRARD:  Nothing, Your Honor.

17          THE COURT:  Anything else you want to say,

18  Mr. Oudomsine?

19          THE DEFENDANT:  No, Your Honor.

20          THE COURT:  I appreciate Mr. Jarrard bringing out

21  certain things.  He brought out some things that are important

22  and has done that with a view towards encouraging the Court to

23  employ the aberrant behavior aspect that the defense, no doubt,

24  devoutly wishes.

25          I see another situation.  I see a man who has

virtually complete family support.  I see a man who has the
support of friends and colleagues of long duration.  I see a
person who has been given a great deal of opportunity, who is a
very intelligent individual, who is an educated individual, and
whose family, according to the information I have about other
family members, appreciates education and the opportunities
that they have found in their adopted land.

I see a nation -- indeed, a world -- which is reeling
from the economic effects and expected economic effects of the
pandemic which I do not mean to overstate or over-rate, nor do
I wish to underestimate.  This has been a trying time and we
are just now in February of 2022 emerging from the mantel that
has covered us since this time in 2020.  In an effort to boost
or support the enviable American economy -- the lodestar of the
world, if you will -- a well-intended Congress, a well-intended
President risks inflation and other ills to gain an immediate
effect -- beneficial effect -- for the then somewhat-crippled
economy with the CARES Act.

You can't just say it in terms of billions.  We've had
by a rough estimate account in stimulus funds and CARES Act and
other infusions into the economy we've run the national debt up
probably by $6 trillion or more in all of this.  And I have no
intention of being ironic or sarcastic.  I can say, though,
without any hesitation that for his part in all of this
Mr. Oudomsine has expressed his gratitude for the efforts of

1  the Congress, the administration, the President, and the

2  taxpayers of this country with an $85,000 insult, and that's

3  what it amounts to -- not just a flippant show of some obscene

4  gesture, but a carefully planned, carefully executed

5  application to a salutary program for the most venal objective:

6  To steal $85,000 from the taxpayers of this country.

7          With every expectation after spilling the beans to the

8  FBI he was to walk in the courtroom, make an apology, and walk

9  out which, of course, did not happen, and now we are spinning

10 the wheels of the government which do not turn inexpensively --

11 in addition to having opened an FBI investigation here and a

12 federal prosecution, we've got Mr. Cunningham engaged in the

13 business of selling this -- I feel foolish every time I say it

14 -- Pokémon card.

15         Now we've got a war going on in which happily we are

16 not yet engaged and the market may have changed.

   Mr. Cunningham will find out.  I don't know, but as far as I'm

18 concerned in all of this the insult continues, and whether or

19 not the $85,000 is immediately repaid which is a matter of

20 great interest, obviously, to the presiding Judge, it is not a

21 merit badge if it is.  It is still an expensive undertaking for

22 the government of the United States which does not operate on

23 air but on money just like everything else, and it's likely

24 that there will never be a full restitution of all of the money

25 that this costs.  So there is no thank you note for

1    restitution.  Restitution is the minimum that is expected.

2         While I will agree with the defense that Mr. Vinath

3    Oudomsine has not done anything like this in the past, when he

4    did it, he did it with the facility and with the ability and

5    with a level of venality that his age, his education, his

6    upbringing, and his life experience make it all the more

7    culpable.

8         I have determined that there is no reason why judgment

9    and sentence should not be imposed at this time in the case.  I

10   have afforded the defendant and his counsel an opportunity to

11   be heard.  I have reviewed and considered the Presentence

12   Investigation Report, including the advisory guideline range,

13   and I have stated my findings relative to the report, and now

14   pursuant to the provisions of the Sentencing Reform Act and the

15   applicable provisions of the sentencing guidelines which are

16   very helpful, but, more importantly, pursuant to the provisions

17   of Title 18, United States Code, Section 3553(a), particularly

18   those related to the fashioning or molding of a sentence which

19   is sufficient, but not greater than necessary, to meet the

20   crime this man committed and to demonstrate to the world the

21   likely result of the commission of the same or similar criminal

22   act -- that is, deterrence, which I deem to be the most

23   important factor in this case -- it is hereby ordered,

24   adjudged, and decreed that Vinath Oudomsine is committed to the

25   custody of the Bureau of Prisons for the purpose of

1   imprisonment for the term of 36 months.

2          This is above the guideline range.  The guideline

3   range is calculated on the run-of-the-mind type of fraud --

4   perhaps an insurance scam, perhaps a banking scam -- but when

5   an individual sets out not by accident but by means of his

6   education, ability, and background to steal money from a

7   national benevolence, a program which was created with plenty

8   of loopholes, as it were, to make this money available and to

9   make it available quickly and to bring the deterioration of the

10  economy in check, when it is done in that manner with such a

11  blatant disregard for the people who needed these funds and for

12  the people who paid for this program, then the guidelines

13  should defer to practicality and that's what it needs to

14  demonstrate to the world that this is the consequence of such

15  activity.  So for those reasons, I am departing, and those

16  will be transcribed and placed in the Judgment and Commitment

17  Order.

18          Upon release from imprisonment the defendant is placed

19  on supervised release for three years.  While on supervised

20  release he is to comply with the standard conditions of

21  supervision adopted by this court and the mandatory conditions

22  required by federal law.  Further, the defendant is to

23  cooperate in the collection of a DNA sample as directed.  While

24  on supervised release the defendant is to comply with certain

25  special conditions imposed by the Court.  These special

1    conditions are reasonably necessary to achieve the purposes of

2    sentencing.  The following special conditions are imposed and I

3    will ask the probation officer to announce those, please.

4              PROBATION OFFICER RIGGS:   Thank you, Your Honor.

5         The defendant must submit to substance abuse testing

6    to determine if he has used a prohibited substance.  The

7    defendant must not attempt to obstruct or tamper with the

8    testing methods.  The defendant must provide the probation

9    officer with access to any requested financial information and

10   authorize the release of any financial information.  The

11   probation office may share such information with the U.S.

12   Attorney's Office.  The defendant must not incur new credit

13   charges or open additional lines of credit without the approval

14   of the probation officer.  The defendant shall not maintain

15   more than one financial institution account or be an assignor

16   on a financial institution account without the prior approval

17   of the probation officer.

18        The defendant must pay the financial penalty in

19   accordance with the schedule of payments attached to the

20   judgment.  The defendant must also notify the court of any

21   changes in economic circumstances that might affect his ability

22   to pay any financial penalty.

23        The defendant must submit his person, property, house,

24   residence, office, vehicle, papers, computers, other

25   electronic-communications or data-storage devices or media to a

1   search conducted by a United States Probation Officer.  Failure

2   to submit to a search may be grounds for revocation of release.

3   The defendant must warn any other occupants that the premises

4   may be subject to searches pursuant to the condition.  The

5   probation officer may conduct a search under this condition

6   only when reasonable suspicion exists that the defendant has

7   violated a condition of supervision and that the areas to be

8   searched contain of this violation.  Any search must be

9   conducted at a reasonable time and in a reasonable manner.

10          A curfew is imposed as a special condition of

11   supervised release and the defendant must comply with the

12   conditions of a curfew from 10 o'clock p.m. until 6 o'clock

13   a.m. for the period of supervision.  During that time the

14   defendant will remain at his place of residence at all times

15   and shall not leave except when such leave is approved in

16   advance by the probation officer.

17          THE COURT:  The probation office is directed to

18   provide to the defendant a written statement setting forth all

19   of the conditions to which the term of supervised release is

20   subject.  Restitution is due in the amount of $85,000 to the

21   U.S. Small Business Administration due and payable immediately

22   from which that restitution there may be deducted the sum of

23   $24,745 when the checks tendered today to the Clerk of Court

24   are negotiated and paid.  The restitution, as I said earlier,

25   is the minimum that is expected as a financial obligation in

1  this case.

2       Upon all of the factors here it is ordered that the

3  defendant is to pay a fine in the amount of $10,000 due and

4  payable immediately.  That fine is contemplated by the Court to

5  be some sort of reimbursement to the United States for the cost

6  of this prosecution and that's why it is imposed.  It is

7  probably just a token, but that is what it is.  Restitution is

8  an obligation that is the floor of the obligation here.

9  Special assessment due and payable immediately in the amount of

10  $100.

11       This defendant is to forfeit his interest in any

12  property constituting or derived from the proceeds obtained as

13  a result of the offense of conviction including the 1999

14  Pokémon trading card which is of record in these proceedings.

15  The Court's Order of Forfeiture on January 7, 2022, is

16  incorporated into the judgment.

17       I am accepting the plea agreement for the usual

18  reasons.  The defendant is remanded to the custody of the

19  United States Marshal and is notified of his right to appeal

20  from this sentence within -- is it 14 days?  Is that the

21  correct time? -- from today.

22       Now that sentence has been imposed I will ask if other

23  than statements earlier made in the record are there any

24  objections to the Court's findings of fact, conclusions of law

25  or the manner in which the sentence was imposed?

1          MR. PORTER:  None from the government, Your Honor.

2          MR. JARRARD:  Your Honor, I need a moment to speak

3     with my client before I conclude.

4          THE COURT:  Sure.

5          MR. JARRARD:  Thank you, Your Honor.  I do preserve my

6     client's right to appeal to argue that the Court's sentence is

7     greater than necessary under 18 U.S.C. § 3553 and otherwise not

8     consistent with the guidelines.

9          Your Honor, I know you took my client into custody at

10    his change of plea; however, I don't believe that the Court is

11    foreclosed from allowing him still to self-surrender to the

12    Federal Bureau of Prisons and I would ask that the Court

13    consider that in this case.  The Court has imposed a lengthy

14    prison sentence and he needs some time to get his affairs in

15    order before serving this lengthy sentence.  So I would ask

16    that he be allowed to self-surrender.

17         THE COURT:  Any comment from the United States?

18         MR. PORTER:  No, Your Honor.

19         THE COURT:  That motion is denied.  The -- I already

20    notified him of his right to appeal.  I agree with you -- the

21    right to appeal has been reinstated.

22         Counsel, thank you for your patience today.  That

23    concludes the matter.

24      (End of Transcript of Record.)

25

1                    CERTIFICATE OF REPORTER

2

3

4

5        I, Lisa H. Davenport, Federal Official Reporter, in and

6    for the United States District Court for the Southern District

7    of Georgia, do hereby certify that pursuant to Section 753,

8    Title 28, United States Code that the foregoing is a true and

9    correct transcript of the stenographically-reported proceedings

10    held and that the transcript page format is in conformance with

11    the regulations of the Judicial Conference of the United

12    States.

13

14                          _____

15                          Lisa H Davenport, RPR, FCRR

16                          Federal Official Reporter

17

18

19

20

21

22

23

24

25